# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | No. 20 CR 280-2 |
| v. | ) | |
| | ) | Judge Andrea Wood |
| Tahkisha Hodge | ) | |
| | ) | |

DEFENDANT TAHKISHA HODGE'S SENTENCING MEMORANDUM

Beginning on May 30, 2020, and continuing for the following week, the City of Chicago and many other cities across the United States were experienced civil unrest related to the murder of George Floyd by Minneapolis police officers. During the unrest, protests that were largely peaceful occurred during the daytime. However, at night the nature of the protests changed and included widespread looting.

On the night of June 1st, Tahkisha Hodge and family members and friends gathered at her house. When the gathering broke up after 1:00 am, she agreed to drive Paris Mickle to an aunt's house where he could spend the night. On the way, they passed a group of individuals outside the PNC Bank at 83rd Street and Cottage Grove in Chicago. The individuals were attempting to break into a drive-through ATM, and had already done substantial damage to the ATM. Ms. Hodge pulled her car over so that she and Mr. Mickel could determine if the group would be successful. Other individuals gradually joined in the effort to pry open the ATM's housing. Eventually, Ms. Hodge and Mr. Mickel got out of her car and joined in the effort. The group, now totaling over a

dozen individuals, continued its attempts until the police arrived about 2:30 AM, at which time everyone scattered.

Ms. Hodge does not deny that she participated in the attempt to break open the ATM and access the money inside. When asked by the people in the group, she even agreed to let them attach one end of a chain to her SUV and the other end of the chain to the ATM in an attempt to rip the housing off when she pulled the car forward. But to be clear, she did not set out that night to loot or break the law. Her participation in this offense happened as a result of coming upon the scene of the offense already in process on a night that was charged with emotion.

Neither Ms. Hodge nor Mr. Mickle instigated the attempt to break into the ATM. In fact, they did not know any of the other participants. That is an important fact: although the other members of the group are Ms. Hodge's co-conspirators in the legal sense of the word, she does not know their identities. This was not a conspiracy in which Ms. Hodge and a group of others made tactical plans and then set out to accomplish those plans with everyone playing a role. Ms. Hodge and Mr. Mickle quite literally stumbled upon a crime in progress and made the unfortunate decision to join in. That decision changed their lives in a matter of about a half of an hour.

Ms. Hodge recognizes that these details do not absolve her of her participation in the offense. However, they provide much needed context when determining the appropriate punishment for her participation. This context, set against the backdrop of massive civil unrest, counsels for a sentence that does

not include a period of incarceration. Accordingly, Tahkisha Hodge, by the Federal Defender Program and its attorney Geoffrey M. Meyer, respectfully requests the Court impose a sentence of one year of probation.

## Discussion

As this Court is well aware, after *Booker* the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). After considering these factors, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimony provision serves as the "overarching" command of the statute. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

## I. The Advisory Guidelines and the PSR; 18 U.S.C. § 3553(a)(4)

The Supreme Court has instructed sentencing courts to begin by properly calculating the advisory guideline sentencing range. *Gall v. United* States, 552 U.S. 38, 49 (2007). Sentencing courts may not, however, presume that a guideline sentence is the correct one, *Nelson v. United States*, 555 U.S. 350, 352 (2009), or even place "a thumb on the scale favoring a guideline sentence," *United States v. Pennington*, 667 F.3d 953, 958 (7th Cir. 2012) (internal quotations omitted); *see also Rita v. United States.* 551 U.S. 338, 351 (2007) (explaining that the district court judge "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply").

In the Presentence Report, the Probation Office calculated a base offense level of six before adding six levels for an actual loss amount of $62,818 (damage to the ATM) and another two levels for possession of a dangerous weapon. The Probation Office reduced the offense level by two levels for acceptance of responsibility and calculated a total offense level of 12. Combined with a criminal history category of II, the Probation Office calculated Ms. Hodge's advisory guideline range of imprisonment as 12 to 18 months. Ms. Hodge objects to both the offense level and criminal history calculations contained in the PSR.

**A. Offense Level**

Ms. Hodge joins the government's objection to the Probation Office's addition of two-levels under Guideline §2B1.1(b)(16)(B) (dangerous weapon) for the use of a blow torch in the offense. While the Probation Office is correct that a blow torch meets the definition of a dangerous weapon found in §1B1.1 application note 1(E) because a blow torch is capable of inflicting serious bodily injury, the circumstances of its use in this case counsels against applying the enhancement. As the government notes in its sentencing memorandum, Ms. Hodge is not seen using or holding the blow torch at any time during the bank surveillance video. Additionally, those individuals that did possess the blow torch did not use it as a weapon or direct its use against another person. The blow torch was used only as a tool. Accordingly, the two-level enhancement is not appropriate in this case. Application note 21(C) to Guideline §2B1.1 allows the Court to make such an adjustment.

**B. Criminal History Score**

The Probation Office assigned Ms. Hodge three criminal history points: one point for a 2019 misdemeanor conviction for causing a child to be endangered, for which she received one year of probation, and two points because Ms. Hodge was on probation for that offense when the instant offense occurred. As a result of these three points, the Probation Office placed Ms. Hodge into criminal history category II. This single entry in her criminal history should not place her in criminal history category II. She asks the Court to adjust her criminal history category to category I.

Under §4A1.3 the Court is able to consider the nature of the prior offenses and the circumstances under which they were committed, to, in effect, put the defendant's record in the context of her life and background. Because the Sentencing Commission has recognized the inherent limitations in the mathematical approach to criminal history, a departure under §4A1.3 does not require unusual or extraordinary factors. *See* U.S.S.G. §4A1.3 (background commentary) ("[T]he criminal history score is *unlikely* to take into account all the variations in the seriousness of criminal history that may occur.") (emphasis added). Instead, the Commission has instructed courts to place the defendant in the criminal history category that most accurately reflects the seriousness of his prior record. This was true even before the Supreme Court ruled the Guidelines were advisory and not mandatory. *See, e.g., United States v. Abbot*, 30 F.3d 71, 72-73 (7th Cir. 1995).

Ms. Hodge's 2019 conviction demonstrates the dangers of over-policing and the compounding effects of relying on the criminal justice system to address non-violent, non-criminal societal issues. On July 7, 2019, Ms. Hodge invited her 11 year-old nephew, G.H., to spend the night at her house with his cousin, Ms. Hodge's 10 year-old son, L.R. As related to the Probation Officer by G.H.'s father, during the evening the boys began fooling around with water balloons. (PSR ¶45) Ms. Hodge explained to counsel that this occurred after she went to sleep for the night. At some point, Ms. Hodge's son filled a water balloon from the hot water tap that had been running for a lengthy period of time. As a result, when the balloon struck G.H., it scalded his arm. The boys, being young, were frightened that they would get in trouble and so they did not wake Ms. Hodge to let her know about the injury.

The next morning, Ms. Hodge's stepmother, who usually gets Ms. Hodge's children off to school and picks them up at the end of the day because Ms. Hodge is at work, was running late. The boys were asleep. Still unaware of the injury, Ms. Hodge let the boys sleep and left the apartment, confident that her stepmother would arrive shortly. When her stepmother did arrive and the boys woke up, Ms. Hodge's stepmother noted the extent of the burn on G.H.'s arm and called Ms. Hodge. Ms. Hodge immediately notified G.H.'s parents. G.H.'s mother picked him up and took him to the hospital.

Hospital personnel notified the police of the incident. Even though G.H.'s parents did not believe that Ms. Hodge harmed or neglected their son (PSR ¶45), police proceeded to charge Ms. Hodge with failing to seek medical care for

a minor and leaving two minor children without supervision for an unreasonable amount of time. Ms. Hodge ultimately agreed to plead guilty to the misdemeanor offense of causing a child to be endangered because she was told that if she did not, DCFS would be notified and she would lose custody of her children.

There was no volitional harm in this incident. If the need for outside intervention existed—and Ms. Hodge and her brother (G.H.'s father) submit that the need did not exist—it should have appropriately come from social service personnel. Instead, the police were called, elected to charge Ms. Hodge, and threatened the custody of her children. Like so many people before her, she subsequently pleaded guilty to prevent threatened and more serious consequences.

The effects of that decision have snowballed since her plea. Not only does she incur a criminal history point for the conviction itself, but she incurs two additional points for being on probation at the time of the instant offense. The net result of this overly aggressive policing and prosecution pushes Ms. Hodge into a more serious criminal history category than she should be in. While this result may be technically accurate according to the Guidelines various counting rules, it shows why those rigid mathematical rules are wholly inadequate when it comes to evaluating the nuances of a person's criminal history. Put in the language of the Guidelines themselves, "the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." Accordingly, she asks the Court to adjust her

criminal history score and place her Criminal History Category I, which more accurately represents her criminal history.

The other entries in Ms. Hodge's criminal history support the requested adjustment. While she did have some serious contacts with law enforcement, they occurred when she was much younger, in the tumultuous period after her mother died, and while she was in an abusive relationship. For more than a decade, aside from the misdemeanor offense discussed above, Ms. Hodge's only contact with law enforcement are traffic offenses.

Those offenses are largely related to the period of time when her license was suspended for outstanding unpaid parking tickets. Two points are relevant here: 1) Ms. Hodge satisfied her obligations through a parking ticket amnesty that removed fines and late fees from the total owed, and 2) as of July 1, 2020, the State of Illinois no longer suspends driver's licenses for failure to pay parking tickets and other vehicle compliance tickets. The License to Work Act began the process of decoupling the debt collection process from driving ability because such suspensions were regressive actions that disproportionately affected poor and marginalized communities reinforcing cycles of debt and poverty.[1]

The PSR also notes that there is no longer an automated docket for Ms. Hodge's 2007 conviction for reckless discharge of a firearm and aggravated

---

[1] In the words of one of the Act's sponsors in the Illinois Legislature, "Violence and racism aren't always fast and dramatic. Sometimes it looks like piling tickets and debts on our own neighbors and then taking away their driver's license when they can't climb out of the hole." State Representative Carol Ammons *available at* https://tinyurl.com/z3nses3t (last visited Nov. 22, 2021).

unlawful use of a weapon. (PSR ¶38) In September 2018, in an effort to further turn around her life, Ms. Hodge filed a motion to seal the criminal records related to that offense. Because she had successfully completed her probationary period and because the judge was impressed with the progress she had made even after her probation ended, he ordered the records sealed. (*See* Exh. 3)

In summary, Ms. Hodge's criminal history largely consists of contacts with law enforcement that arise from regressive financial enforcement policies that have since been abandoned by the State of Illinois. To the extent that there are more serious entries in her criminal history, they are stale and do not accrue criminal history points. In at least one case, a judge was impressed enough with her performance on probation and afterward, that he granted her request to seal the case. The only conviction that accrues criminal history points results from a domestic matter that is the result of overly aggressive policing. This is precisely the type of situation contemplated by §4A1.3. Category I more accurately represents the seriousness of Ms. Hodge's history and better takes into consideration the circumstances of her conviction.

## C. The Net Effect of Ms. Hodge's Objections

Without the two-level increase for use of a dangerous weapon, Ms. Hodge's total offense level falls from twelve to ten. With an adjusted criminal history category of I, the advisory guidelines range becomes 6 to 12 months' imprisonment. As discussed further in this memorandum, Ms. Hodge believes

that, when examined with the remaining sentencing factors, a sentence of probation for one year is the appropriate sentence in this matter.

## II. The remaining Section 3553(a) sentencing factors call for a variance below the advisory guidelines range.

In *Gall* the Supreme Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range. 552 U.S. at 47. By rejecting the mandatory and mechanical application of the Sentencing Guidelines, the Supreme Court restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011). The sentencing factors found in § 3553(a) and an examination of the circumstances around Ms. Hodge's offense demonstrate why this individualized approach to sentencing is preferable to a perfunctory application of the Guidelines.

### A. The seriousness of Ms. Hodge's offense must be viewed through the lens of the concurrent massive political and social upheaval. —18 U.S.C. § 3553(a)(1), (a)(2)(A)

The facts of what happened at the PNC Bank early on the morning of June 2, 2020, are not in dispute. But the context surrounding those facts and the motivations for Ms. Hodge's actions are of paramount importance in determining the appropriate punishment for her.

In the eyes of the government and the Probation Office, what happened in this case is clear: Ms. Hodge's actions crossed the line from legitimate protest to criminal activity and she must be sent to prison. Full stop. This view allows

no room for nuance or context. It fails to recognize that the very public and brutal murder of a Black man at the hands of sworn police officers sparked not only nationwide protest, but also an eruption of years of pain, frustration, and resentment on the part of communities that repeatedly have been marginalized and brutalized by the police and criminal justice system. To limit the categorization of the behavior of those participating in the uprisings after Mr. Floyd's murder as a binary choice between good or bad is dangerous. "Riots are complex political phenomena whose outbreak is symptomatic of deeper societal problems. Although it is not immediately obvious amid their destruction...these dynamic and fragmented expressions of protest have political significance." Frank Gadinger et al., *Resistance or Thuggery?: Political Narratives of Urban Riots*, 6 Narrative Culture 88, 103 (2019).

For decades, sociologists have understood that rioters often engage in property destruction and looting as a means of political resistance. *See, e.g.*, Daryl B. Harris, *The Logic of Black Urban Rebellions*, 28 J. Black Studies 368 (1998) (rejecting the "riffraff theory" of urban rebellions); *see also* E.L. Quarantelli & Russell Dynes, *Looting in Civil Disorders: an Index of Social Change*, (finding that "Widespread looting, then, may perhaps be interpreted as a kind of mass protest against our dominant conception of property"). Despite this, sociologists have also observed—again dating as far back as the 1960s— efforts to delegitimize riots as forms of social protest. *See, e.g.*, Stanley Lieberson & A. R. Silverman, *The Precipitants and Underlying Conditions of Race Riots*, 30 American Sociological Review 887, 898 (1965) (noting that riots

are frequently misunderstood by those who attribute rioting to agitators rather than to protestors in search of a means to express their dissatisfaction). Notably, some of this scholarship predates many of the major political riots of the twentieth century, including the 1965 Watts Rebellion in Los Angeles and the 1968 uprisings that broke out in dozens of cities across the country following the assassination of Martin Luther King Jr. Since then, similar riots have occurred in Miami (1980) for Arthur McDuffie, Los Angeles (1992) for Rodney King, and Cincinnati (2001) for Timothy Thomas. Widespread property destruction and looting were characteristic of each of those riots.

Turning to current events from the last decade, sociologists, political scientists, and other scholars have found that rioters have continued to employ vandalism and looting as means of political resistance in response to more recent instances of police brutality—with specific attention paid to unrest in Ferguson and Baltimore. For example, after collecting narratives from protestors involved in the Baltimore riots that arose in response to the police killing of Freddie Gray, scholars observed that, "Ultimately, then, part of this configuration is that violence, looting, and arson became a means to an end when there was no other outlet to express recurring grievances." Frank Gadinger et al., at 103.[2]

Thoughtful consideration of these riots, from 2020 Minneapolis to 1965 Los Angeles, reveals again and again that the political impetus motivating rioters'

---

[2] *See also, id.* at 104 ("It is no coincidence that rioters choose to attack and loot the very power structures most oppressing them").

looting and property destruction is both intelligible and meaningful. That was true of the 1968 Chicago riots, and it is true of the 2020 Chicago riots. With this in mind, characterizing rioting conduct as apolitical, opportunistic, or mindless, is clearly misguided.

The government faults people who participated in looting, like Ms. Hodge, for diluting the message of "peaceful protestors" (Govt. Memo at 8), but the message of the protests was not entirely swallowed by the riot narrative. Consider, for example, the perspective of some shopkeepers and restaurant owners interviewed during that summer who reported that they understood and accepted the property damage and looting they suffered as a part of the protests: one café owner remarked, "Well if this is the price we have to pay for human rights, so be it;" a bar owner said, "It's broken glass and stolen booze. It's an easy fix compared to what people of color are dealing with;" a restaurant owner noted, "All this can be replaced; however, nothing can undo or fix what happened in Minneapolis."[3] On the South Side of Chicago, only a few blocks from where the conduct in this case occurred, Salih Mothana, owner of the Express Food Market on 87th Street, which was heavily looted and vandalized, said "I understand why this happened. If this sends out the message, it doesn't matter to us."[4] As professor Lorenzo Boyd, then-director of the Center for Advanced Policing at the University of New Haven, noted:

---

[3] Serena Dai, *NYC Restaurants Rally to Support Protests, Even with Windows Broken*, Eater (June 1, 2020) available at https://tinyurl.com/u6h3utsu (last visited Nov. 22, 2021).

[4] Leticia Miranda, *First Came a Pandemic. Then, Looting*, NBC New (June 4, 2020) available at https://tinyurl.com/a58paac8 (last visited Nov. 22, 2021).

> In Baltimore, they've been saying for generations how bad the Baltimore Police Department was, but nobody listened. And then Freddie Gray got killed, and nobody listened. And then they started protesting; nobody listened. But as soon as the CVS burned in Baltimore, the whole world watched.

Olga Khazan, *Why People Loot*, The Atlantic (June 2, 2020).

In reality, it is the reductive choice of "good or bad" that most negatively affects the message of the protesters and rioters. That binary choice improperly highlights perceived deficiencies in minority communities and, at the same time, absolves of any blame structural issues such as institutional racism and widespread distrust of the police. *See* Gadinger at 102. The "either/or" analysis leaves no room to discuss, for instance, what role decades of systemic abuses by the Chicago Police Department against minorities (documented in a scathing 2016 report by the U.S. Department of Justice) played in laying the groundwork for the riots. Nor does it allow for discussion about how the Chicago Police Department's failure to comply with the subsequent 2019 consent decree also contributed.[5]

Specifically relevant here, such a limited analysis fails to acknowledge that Ms. Hodge, as a Black woman living on the South Side of Chicago, has been subject to the same type of systemic racism. The circumstances surrounding her conviction for child endangerment comprise just one glaring example.

The point of this discussion is not to relieve Ms. Hodge of responsibility for her actions on the morning of June 2, 2020. Ms. Hodge pled guilty because she

---

[5] *See, e.g.,* https://tinyurl.com/2w8jnnzs (last visited Nov. 22, 2021).

recognizes that she is guilty of the crime charged and she accepts responsibility for her actions. But, as a society, we should look behind those actions to the root causes when determining the correct punishment. Context and motivation always matter in a sentencing hearing, but they take on even more importance in this case. George Floyd's murder represented a profound shared trauma for society at large, and Black and Brown communities in particular. The eruption of emotion, pain, and frustration in that trauma's wake resulted in a unique moment in our history as a nation. The U.S. Sentencing Guidelines and their mathematical formulas are wholly incapable of correctly interpreting and digesting that moment. The Guidelines should be given minimal weight in determining the appropriate sentence for Ms. Hodge. Simply put, when her offense is considered in the context of the upheaval of that week, it is clear that incarceration is not the right answer and would be far, far greater than necessary to achieve any legitimate purpose of punishment.

### B. Ms. Hodge's performance during the over 16 months she has remained on bond demonstrate that the need for specific deterrence is minimal—18 U.S.C. § 3553(a)(2)(C)

Ms. Hodge has been on some form of pretrial release (through Cook County or the Northern District of Illinois) for over 16 months. During that time, there have been no violations. She has used the time to focus on her two teenage sons and to better her family's position. Realizing that her conviction would jeopardize her employment with the Illinois Department of Human Services, she recently started a new position as a health services assistant.

Ms. Hodge takes her role as a mother very seriously. As she explains in her letter to the Court (Exh. 1), she has used what happened last summer and her criminal charges as a teaching moment for her children. She wants them to understand how the choices a person makes have repercussions and she wants them to learn from her errors.

Ms. Hodge is also a survivor and a fighter. Since her late teen years, she has not had strong adult role models in her life. Her biological father was absent for most of her childhood. (PSR ¶68) Both of her biological parents died while she was still a teenager. (PSR ¶¶68, 69) Her stepfather struggled with a drug addiction that eventually led to his death from an overdose. (PSR ¶69) These events likely explain how Ms. Hodge ended up in a long-term abusive relationship with the father of her oldest child. (PSR ¶73)

Despite these obstacles, Ms. Hodge has survived. She eventually extricated herself from the abusive relationship. She also successfully parented two children. It is these aspects of Ms. Hodge's character—a devotion to family and a caretaker to her children—and not the events of June 2, 2020, that far more accurately represent who she is as a person.

### C. A sentence to probation sufficiently addresses the various needs of the public—18 U.S.C. § 3553(a)(2)(B), (C)

Congress, when determining the appropriate punishment for this type of offense, did not foreclose probation as a possible sentence. *See* 18 U.S.C. § 3561(a); 18 U.S.C. § 371. For several reasons, particularly her lack of substantial criminal history, her positive performance on pretrial release, and

her employment, Ms. Hodge seems uniquely positioned to be supervised by the probation department.

Probationary sentences, while qualitatively less severe than equivalent terms of custodial sentences, are still significant punishment. The Supreme Court acknowledged this in *Gall*, 552 U.S. at 48, while discussing the liberty restrictions to which probationers are subject. Counsel strongly believes that a sentence to straight probation is the appropriate outcome here. To the extent the Court disagrees and feels greater punishment is necessary, that punishment need not come from incarceration in the Bureau of Prisons. The Court can fashion conditions of probation, including a period of home detention or the addition of community service hours, to meet that incremental need.

Probation is also an accepted and legitimate form of punishment. The Bureau of Justice Statistics of the U.S. Department of Justice annual report on probation and parole in the United States is instructive. The most recent report tells us that in 2019, just under 1.9 million individuals were sentenced to probation federally and at the state level.[6] At December 31, 2019, there were approximately 3.5 million people on probation in this country.[7] This represents 1 in 73 U.S. adult residents.[8] These figures confirm that community supervision is employed regularly as punishment in the courts of the United

---

[6] Probation and Parole in the United States, 2019, by Barbara Oudekerk, Ph.D. & Danielle Kaeble, July. 2021, at 7. (*available at* https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/ppus19.pdf).

[7] *Id.* at 2 (Table 1).

[8] *Id.* at 6 (Table 4).

States. Furthermore, probation works: From 2000 to 2014, the reincarceration rate for people on probation (whether for new offenses, revocations, or other reasons) has remained very low, hovering just under 5%.[9] In appropriate cases, such as a non-violent offender who has performed well on pretrial release and is employed, supervision by a probation officer achieves the specific sentencing goals found in section 3553(a) in the most effective manner.

It is true that the vast majority of people on probation are subject to probation through state criminal justice systems. Of the nearly 3.5 million people on probation at the end of 2019, only 14,142 were on probation through the federal system.[10] That is because far fewer criminal cases move through the federal system. As a percentage, in Fiscal Year 2020 about 8% of total federal cases received non-incarceration sentences.[11] That number jumped to 28% for defendants sentenced under Guideline §2B1.1 (like Ms. Hodge's case).

Moreover, the Court should view this crime as akin to state property crime. Although the federal government had the ability to charge this matter federally because the FDIC insured the bank funds inside the ATM, the question remains whether there is a sound reason to justify removing this case from state court to federal court. State courts, because of the volume of cases they adjudicate, have a unique expertise when it comes to property crimes like this

---

[9] *See id.* generally and expressing reincarceration rate as a ratio of the number of exits from probation due to return to incarceration to the probation population at risk of reincarceration (defined as number of people on probation at the beginning of the year plus probation entries for the year).

[10] *Id.* at App'x Table 7.

[11] U.S. Sentencing Comm'n Interactive Sourcebook at Table 13 available at https://tinyurl.com/fbxmwt52 (last visited Nov. 22, 2021).

one. And it appears that in the view of the Circuit Court of Cook County, probation is a valid and appropriate sentence for cases that occurred in the aftermath of George Floyd's murder. Attached as Exhibit 4 is a list pulled from publicly available docket information of the resolution of looting cases in which the defendant received probation. This Court should follow the lead of the state courts and sentence Ms. Hodge to probation. *See also* 18 U.S.S.C. §3553(a)(6) (directing sentencing courts to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct).

Deterrence is, of course, two-fold; the other component is general deterrence. But general deterrence need not come from incarceration. The certainty of being caught, rather than the severity of the punishment imposed is a "vastly more effective deterrent."[12] Empirical research supports this conclusion and shows no relationship between sentence length and deterrence. *See, e.g.,* National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, Committee of Causes and Consequences of High Rates of Incarceration, at 342, J. Travis, B. Western, and S. Redburn, Editors (2014) ("research indicates that the large increase in incarceration rates has not clearly yielded sizable reductions in crime."); Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?* 100 J. Crim. L. & Criminology 765, 817 (2010) ("[I]n virtually every

---

[12] Office of Justice Programs, National Institute of Justice, "Five Things About Deterrence" (6/5/2016), available at: https://nij.gov/five-things/pages/deterrence.aspx (last visited Nov. 22, 2021).

deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.").

The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. *See The Growth of Incarceration in the United States*, at 345 ("the decision to commit a crime is more likely influenced by the certainty and swiftness of punishment than by the severity of the criminal sanction"). In other words, this prosecution, by itself, has the greatest deterrent effect. It sends a strong message to others in the community: if you commit a crime, you will be caught and punished by being beholden to the criminal justice system for years. The marginal increase in deterrence from adding a small term of imprisonment would be minimal.

To be clear, this is not a request to disregard section 3553(a)(2)(B)'s requirement to consider deterrence. Rather it is an explanation that the certainty of punishment outweighs the severity of punishment from a deterrence perspective. General deterrence can be accomplished by many different types of sentences and courts should weigh those types of sentences— including nonincarceration sentences—accordingly. *See* 18 U.S.C. § 3553(a)(3) (directing sentencing courts to consider the kinds of sentences available).

**D. The Court should consider the conditions of incarceration that Ms. Hodge would face because of the coronavirus pandemic if she is incarcerated—18 U.S.C. § 3553(a)(2)(A)**

It is simply not possible to discuss sentencing a federal defendant at the moment without addressing how the pandemic has changed the nature of

incarceration, both currently and for the foreseeable future. The harsh conditions that inmates now face require a reexamination of the balance between the need for the sentence to reflect the seriousness of the offense and what constitutes just punishment.

If the Court were to incarcerate Ms. Hodge now, she would be in danger. Public health officials have warned since the beginning of the pandemic that inmates are in a uniquely dangerous position.[13] CDC guidelines are simply impossible to implement at any penal institution. "Social distancing is especially difficult in jails and prisons. The CDC summarizes these challenges as including crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, transport of incarcerated or detained persons in multiperson vehicles for court-related, medical, or security reasons." *United States v. Gakhal*, No. 15 CR 470-1, 2020 WL 3529904, at *2 (N.D. Ill. June 30, 2020) (Lefkow, J.). Thus, "because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons." *United States v. Jemal*, No. CR 15-570, 2020 WL 1701706, at *1 (E.D. Pa. Apr. 8, 2020) (citing an affidavit from Dr. Brie Williams, a physician). While vaccine roll-out in BOP is helping to some degree, currently, BOP reports active infections at 96 of its facilities and 19 residential reentry centers.[14]

---

[13] https://tinyurl.com/4n42ekk9 (last visited Nov. 22, 2021).
[14] https://www.bop.gov/coronavirus/ (last visited Nov. 22, 2021).

Because of COVID-19 and everything it brings with it—lockdown type restrictions, danger from infection, and an overburdening of the medical staff that can affect treatment for other conditions—any time Ms. Hodge spends in prison will necessarily be more severe than it would be under ordinary circumstances. The Court should account for the unprecedented severity of the nature of BOP confinement by declining to impose any term of incarceration in this case. *See, e.g., United States v. Olawoye*, No. 1:15-CR-00172-AA-5, 2020 WL 4559816, at *5 (D. Or. Aug. 7, 2020) ("The sentence defendant has served has undoubtedly been harsher than the one originally contemplated at the time of sentencing."); *United States v. Armstrong*, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020) (acknowledging in the context of compassionate release that defendants are now receiving lower sentencing recommendations because their time in custody is harsher); *United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (finding merit to the argument that "the harsher the conditions the shorter the sentence should be").

**E. The need to provide restitution to PNC Bank—18 U.S.C. § 3553(a)(7)**

Ms. Hodge knows that any sentence imposed will necessarily include approximately $60,000 in restitution, a financial obligation that will not only follow her during her period of probation, but for the next 20 years. *See* 18 U.S.C. § 3613(b), (f), § 3663(m). Although there were over a dozen people involved in damaging the ATM, only Ms. Hodge and Mr. Mickle will be responsible for the full amount of the damage, because the identities of the other individuals are not known.

When fashioning the sentence in this case, the Court should endeavor to put Ms. Hodge in the best possible position to repay PNC Bank as quickly as possible. *See* 18 U.S.C. § 3553(a)(7), *United States v. Peterson*, 363 F. Supp. 2d 1060, 1062 (E.D. Wisc. 2005) (varying from guideline range in part to facilitate payment of restitution because guideline imprisonment sentence would have cost defendant his job and impaired ability to repay restitution). Ms. Hodge currently has steady employment. If she is incarcerated, she will lose her job. This would delay her ability to make meaningful restitution payments. In fashioning the appropriate sentence, the Court should seek to maximize, rather than curtail, Ms. Hodge's ability to pay restitution.

## III. Proposed Conditions of Supervised Release

In the PSR, the Probation Office recommends fairly standard conditions of supervised release. The proposed conditions are largely supported by the facts and circumstances of this case and do not seem more burdensome than necessary. With the exception of the conditions outlines below, Ms. Hodge has no objections to the proposed conditions:

• *Mandatory Condition # 6: Drug Testing* – Although this condition is mandatory, the Court may suspend it if a defendant is at low risk of future substance abuse. Ms. Hodge reported experimenting with marijuana one time and reported no other drug use. (PSR ¶88) All drug tests administered while on pretrial release resulted in negative tests. (PSR ¶89) This offense was in no way related to drug usage or possession. Accordingly, the Court need not impose a drug testing condition.

• *Discretionary Condition # 16: Probation Officer Visits* – Ms. Hodge objects only to the portion of this condition that allows a probation officer to visit her at "other reasonable location specified by the probation officer." The term "other reasonable location" is subjective. Ms. Hodge asks the Court to omit that portion of the condition altogether or to alter it to read "other reasonable location agreed to in advance by defendant and probation officer." *See United States v. Kappes*, 782 F.3d 828, 848 (7th Cir. 2015) (discussing the need for crucial terms of supervised release to be defined in objective rather than subjective terms). The Court can modify these terms later if they prove to be insufficient.

• *Special Condition # 1: GED preparation course* – Ms. Hodge passed the tests required to obtain her GED. A copy of her test results are attached as Exhibit 5. Accordingly, this condition is unnecessary.

## Conclusion

Ms. Hodge recognizes that what she did was wrong, but she asks the Court to consider the Supreme Court's logic in *Gall*, where the Court reasoned that respect for the law is promoted when harsh punishment is tempered by consideration of an offender's character and personal history, in addition to the specific characteristics of the case at hand. *See* 552 U.S. at 54.

**Wherefore**, based on the sentencing factors and arguments set forth above, Tahksiha Hodge respectfully requests that this Court impose a sentence of one year of probation. Such a sanction is sufficient, but not greater than necessary, to satisfy the statutory sentencing objectives in her case.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:    <u>s/ Geoffrey M. Meyer</u>
Geoffrey M. Meyer
Attorney for Tahkisha Hodge

Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326